IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANDRE RENARD CLINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV266 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Andre Renard Clinton ("Plaintiff") brought this action pursuant to Section
205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial
review of a final decision of the Commissioner of Social Security denying his claim for
Disability Insurance Benefits under Title II of the Act. The parties have filed cross-motions
for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disability Insurance Benefits on February
19, 2014, alleging a disability onset date of January 24, 2014. (Tr. at 18, 161-67, 182-83.)[2]  His
application was denied initially (Tr. at 63-69, 84-92) and upon reconsideration (Tr. at 70-79,

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal
Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this
suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of
the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #9].

94-101). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 102-03.) On November 4, 2016, Plaintiff, along with his attorney and an impartial vocational expert, attended the subsequent hearing. (Tr. at 37-62.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 15-31), and, on February 6, 2018, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6, 13-14, 160).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 20.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease of the lumbar spine with left radiculopathy status-post laminectomy; status-post left femur fracture with closed reduction and intramedullary nailing repair.

(Id.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 22.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform light work with further limitations. Specifically, the ALJ found that Plaintiff can

> perform light work as defined in 20 CFR 404.1567(b) including stand and walk up to six hours in an eight-hour day, can sit for up to six hours in an eight-hour

day except can occasionally climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; frequently balance; occasionally stoop, kneel, crouch, and crawl; and can tolerate occasional exposure to extreme cold.

(Tr. at 23.) Under step four of the analysis, the ALJ determined that Plaintiff did not have any past relevant work. (Tr. at 30.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 30-31.)

Plaintiff now raises three challenges to the ALJ's decision. First, Plaintiff argues that the ALJ "fail[ed] to conduct a proper function-by-function analysis of [Plaintiff's] impairments" (Pl.'s Br. [Doc. #15] at 5) in violation of Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), and Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2, 1996) ("SSR 96-8p") (Pl.'s Br. at 6). Second, Plaintiff contends that the Commissioner's "assertion of the affirmative defense of *res judicata* was improper." (Id. at 16.) Third, Plaintiff asserts that his "claim should be remanded for a new hearing before a different constitutionally appointed judge because [ALJ] Saindon's appointment did not comply with the Appointments Clause at the time she rendered her decision in [Plaintiff's] claim." (Id. at 17.) After a careful review of the record, the Court finds no basis for remand.

A.      Function-by-Function Assessment

Plaintiff first "contends that the ALJ's failure to conduct a proper function-by-function analysis of [Plaintiff's] impairments prevented the ALJ from determining (i) whether [Plaintiff's] left upper extremity impairment was a medically determinable impairment and the

impact it would have on the RFC, (ii) determining whether [Plaintiff] would require a cane for work activities involving standing and/or walking and determining whether [Plaintiff] would require an option to alternate between sitting, standing and walking throughout the workday for pain management and (iii) properly assessing the opinions of the treating physicians," in violation of Mascio and SSR 96-8p (Pl. Br. at 5-6). Plaintiff additionally faults the ALJ for improperly evaluating his subjective complaints of pain. (Pl. Br. at 15-16.) Plaintiff's contentions do not warrant relief.

As SSR 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. SSR 96-8p, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, No. 12-1098, 2016 WL 3349355, at *9 (4th Cir. June 16, 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or

uncontested.'" Mascio, 780 F.3d at 636 (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637; see Monroe v. Colvin, 826 F.3d 176, 187-88 (4th Cir. 2016) (remanding because ALJ erred in not determining claimant's RFC using function-by-function analysis because ALJ also erroneously expressed claimant's RFC first and then concluded that limitations caused by claimant's impairments were consistent with that RFC).

1.    Left Upper Extremity Impairment

Plaintiff asserts that the ALJ erred by "evaluat[ing] only [Plaintiff's] back, leg and anxiety in the decision and mak[ing] no mention of [Plaintiff's] left arm pain other than noting it in her summary of [Plaintiff's] testimony." (Pl.'s Br. at 11 (internal citation omitted) (citing Tr. 20-21, 24).) Plaintiff points out that he "testified to difficulty with pain, weakness and cramping in his left arm and hand that limited his ability to use his left arm for some activities" (id. (citing Tr. at 51)), and that "he has a history of left upper extremity and hand problems that have been treated by physicians" (id. at 12). According to Plaintiff, his left upper extremity problems qualify as a severe impairment, and "the ALJ's failure to indicate whether or how

she considered the limitations caused by [Plaintiff's] limited ability to use his left upper extremity and hand is error," because "[t]he [vocational expert] testified that if [Plaintiff] was limited to occasional fingering and handling with the non-dominant left hand the jobs [the vocational expert] had listed would be eliminated as would most other light work activity." (Id. (citing Tr. at 61).)

As an initial matter, although Plaintiff maintains that "he has a history of left upper extremity and hand problems that have been treated by physicians," he does not cite to any record evidence in support of that assertion. (Id. at 12 (emphasis added).) Indeed, reviewing the record, it appears that Plaintiff's only complaint of left arm symptoms to a medical provider occurred on October 17, 2016 (Tr. at 731-32), less than three weeks before the ALJ's hearing, which fails to demonstrate a "history" of left upper extremity problems. Moreover, despite Plaintiff's allegation that "the ALJ ma[de] no mention of [Plaintiff's] left arm pain other than noting it in her summary of [Plaintiff's] testimony" (id. at 11 (citing Tr. 24)), the ALJ discussed all of the evidence of Plaintiff's left upper extremity problems that existed in the record: Plaintiff's inclusion of left hand numbness as one of several disabling impairments on his application for benefits and Disability Reports (Tr. at 24, 161, 258, 274), Plaintiff's testimony regarding his left hand symptoms at the hearing (Tr. 24, 51-52), and Plaintiff's sole complaint of left arm pain, tingling, and numbness to a doctor at his primary care physician's clinic on October 17, 2016 (Tr. at 27, 731-32). Plaintiff has simply not shown that the ALJ overlooked any evidence relevant to Plaintiff's left upper extremity problems.

Plaintiff also maintains that the ALJ should have found Plaintiff's left upper extremity problems a severe impairment at step two of the sequential evaluation process and discussed

how that impairment impacted Plaintiff's RFC. (Pl.'s Br. at 12.) However, a medically determinable impairment:

> must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . . [U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings.

Social Security Ruling 96-4p, Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations, 1996 WL 374187, at *1 (July 2, 1996) ("SSR 96-4p") (emphasis added). Here, as discussed above, the evidence regarding Plaintiff's left arm condition consists solely of his own subjective reports of symptoms. (Tr. at 51-52, 161, 258, 274, 731-32.)[5] Because Plaintiff did not provide objective evidence that his left upper extremity condition constituted a medically determinable impairment, the ALJ's failure to expressly discuss Plaintiff's left upper extremity problems at step two amounts to harmless error (if error at all), and the ALJ labored under no obligation to include limitations arising from Plaintiff's left arm problems in the RFC (or the dispositive hypothetical question).[6]

---

[5] In response to Plaintiff's complaints of left arm symptoms on October 17, 2016, Dr. Tina Lai ordered a cervical spine x-ray (Tr. at 732), but no record evidence exists that the x-ray actually occurred or what the results may have been.

[6] Moreover, the Court also notes that although the ALJ did not include Plaintiff's left hand complaints as a severe impairment at step two, any error is harmless in any event, as the ALJ discussed all of the medical evidence and Plaintiff's complaints in setting the RFC. For example, after discussing Plaintiff's testimony, including his cramps in his left hand, the ALJ also cited evidence regarding Plaintiff's ability to engage in activities of daily living, including that "[h]e would make his own sandwiches or frozen dinners. He could fold clothes. He could also wash his dishes. He would get outside daily and could drive places by himself. He would shop for groceries once a week," indicating that Plaintiff was not as limited as he alleged. (Tr. at 24, 240-47.) In addition, the ALJ reviewed the medical evidence, and specifically noted that Plaintiff's first complaints

2.	Cane for Ambulation

Plaintiff next challenges the ALJ's failure to account in the RFC for Plaintiff's use of a

non-prescribed cane. (Pl.'s Br. at 12-13.) "The requirement to use a hand-held assistive device

may . . . impact [a claimant's] functional capacity by virtue of the fact that one or both upper

extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20

C.F.R. Part 404, Subpt. P, App'x 1, § 1.00(J)(4). Accordingly, an ALJ must consider the impact

of a "medically required" hand-held assistive device on a claimant's RFC. See McLaughlin v.

Colvin, No. 1:12CV621, 2014 WL 12573323, at *2 (M.D.N.C. July 25, 2014); Social Security

Ruling 96-6p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do

Other Work -Implications of a Residual Functional Capacity for Less Than a Full Range of

Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p").

SSR 96-9p explains the impact of an assistive device on an RFC for sedentary work,

and courts within this circuit have applied this ruling "to the light occupational base as well,

since it involves even greater lifting than sedentary work. . . .  Additionally, a plaintiff always

bears the burden of proving his RFC, and therefore the standards in SSR 96-9p can be useful

in determining if a plaintiff met that burden." Timmons v. Colvin, No. 3:12CV609, 2013 WL

4775131, at *8 (W.D.N.C. Sept. 5, 2013). Notably, SSR 96-9p provides the following guidance:

> To find that a hand-held assistive device is medically required, there must be
> medical documentation establishing the need for a hand-held assistive device to
> aid in walking or standing, and describing the circumstances for which it is
> needed (i.e., whether all the time, periodically, or only in certain situations;
> distance and terrain; and any other relevant information). The [ALJ] must
> always consider the particular facts of a case. For example, if a medically

---

of left arm pain were not until his primary care visit in October 2016 (three weeks before the hearing), and as
noted by the ALJ, even that record reflected he could still function. (Tr. at 27, 731-32.) In the circumstances,
the Court does not see any error or any failure to fully evaluate the evidence, and any error in failing to address
Plaintiff's left hand complaints at step two appears harmless.

required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7. In short, "even if a cane is prescribed, it does not necessarily follow that it is medically required." Wimbush v. Astrue, No. 4:10CV36, 2011 WL 1743153, at *3 (W.D. Va. May 6, 2011).

In support of Plaintiff's assertion that, even after his femur fracture healed, he continued to require a cane for ambulation, Plaintiff points to his testimony that he used a cane "'[o]n occasions'" and only if he had to go out and thought he might need it, that he lived in an apartment for disabled individuals, and that he "mostly r[o]de the cart" when grocery shopping (Pl.'s Br. at 12-13 (quoting Tr. 52, 53)), as well as evidence that he continued to suffer from an antalgic gait and pain, weakness, and decreased sensation in the left lower extremity (id. at 13 (citing Tr. 48-50, 621-23, 664-65, 667-69, 680-83, 712-13, 715-16, 731-32)). However, as correctly noted by the ALJ, although Plaintiff "did have a period of significant loss of functioning due to his fracture" (Tr. at 30), which included "walking with crutches" and "an antalgic gait" (Tr. at 26), Plaintiff "had minimal follow-up care for his leg after it initially healed, . . . reported that the pain from his fracture had resolved[, and] . . . recovered as expected", with full range of motion, normal strength, and normal muscle tone. (Tr. at 30, 26). Specifically with respect to the use of a cane, the ALJ noted that Plaintiff did not indicate the need for a cane on his Disability Report, and did not bring a cane to the hearing. (Tr. at 24, 54-55, 246). In addition, the ALJ noted that by Plaintiff's own testimony "he would just use a cane on occasion[]." (Tr. at 24, 53.) In this regard, Plaintiff testified only that he would use a cane "[o]n occasions, only if I have to go out and I think I may need it I keep it close

by." (Tr. at 53.) Lastly, no physician of record prescribed a cane for Plaintiff (Tr. at 53), much less described the circumstances under which Plaintiff should use a cane. Accordingly, Plaintiff has not shown that the ALJ erred by failing to include the use of a cane for ambulation in the RFC, and substantial evidence supports the ALJ's determination.

### 3.    Sit/Stand Option

Plaintiff argues that the evidence he cited in support of his continued need for a cane also supports his need to "change positions, as needed for pain relief." (Pl.'s Br. at 13.) According to Plaintiff, the ALJ's failure to include "a sit-stand-walk option" in the RFC is error, because "the [vocational expert] testified that all competitive work would be precluded if [Plaintiff] required the ability to walk away from the work station when changing positions for [five to ten] minutes to relieve pain, cramping, etc." (Id. (citing Tr. 61).) However, Plaintiff has failed to point to any record evidence that would have compelled the ALJ to include in the RFC "the ability to walk away from the work station when changing positions for [five to ten] minutes." (Id.) The ALJ gave "great weight" to the state agency consultant at the reconsideration stage of review (Tr. at 28), who opined, on March 10, 2015, that Plaintiff remained capable of a range of light work (including standing and/or walking with normal breaks for up to six hours in an eight-hour workday), with additional limitations that did not include a sit/stand option, much less a "sit-stand-walk option" or the need to "walk away from the work station" (Tr. at 75-76). The ALJ also accorded "great weight" to the opinions of Dr. Scott C. Wilson (Tr. at 28-29), an orthopedist who treated Plaintiff in the aftermath of his femur fracture, who concluded, on April 30, 2014, that Plaintiff remained capable of light-medium work and neither restricted his ability to stand or walk, nor included a sit/stand option

(Tr. at 606). Under such circumstances, Plaintiff has not shown that the ALJ's failure to include a sit/stand option in the RFC constituted error. <u>See Lamonds v. Berryhill</u>, No. 1:16CV1145, 2017 WL 1906755, at *10 (M.D.N.C. May 9, 2017) ("[T]he ALJ's omission of a sit/stand option from the RFC and hypothetical question(s) does not constitute error, because no medical source of record opined that Plaintiff required a sit/stand option.").

### 4. Dr. Wilson's Opinions

Plaintiff next faults the ALJ for assigning "great weight" to the April 30, 2014 opinion of his own treating physician, Dr. Wilson, who opined that Plaintiff remained capable of light-medium work. Plaintiff contends that Dr. Wilson's opinion "is neither supportable nor consistent with the evidence in the record." (Pl.'s Br. at 14 (citing Tr. at 28-29).) ALJs must evaluate medical opinions in accordance with 20 C.F.R. § 404.1527(c), better known as the "treating physician rule." This rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c). If "a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling 96-2p, <u>Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions</u>, 1996 WL 374188, at *4 (July 2, 1996) ("SSR 96-

2p"); [7] 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.

Instead, the opinion must be evaluated and weighed using all of the factors provided in 20

C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the

frequency of examination, (3) the nature and extent of the treatment relationship, (4) the

supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether

the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to give controlling weight to a treating source opinion, he must

"give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into

account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation

for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL

185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96-2p, 1996 WL

374188, at *5 (noting that ALJ's decision "must contain specific reasons for the weight given

to the treating source's medical opinion, supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ]

gave to the treating source's medical opinion and the reasons for that weight").

The ALJ evaluated Dr. Wilson's April 30, 2014 opinion as follows:

> On April 30, 2014, [Dr. Wilson] believed [Plaintiff] had no[t] yet reached
> maximum medical improvement and had a fifty percent permanent partial
> impairment of total disability benefit. He found [Plaintiff] would be restricted
> to light medium duty, and though[t] [Plaintiff] could lift thirty pounds maximum
> with frequent lifting or carrying of up to twenty pounds. [Dr. Wilson's]

---

[7] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

treatment notes from April 30, 2014 reflected he believed [Plaintiff] could proceed with light duty. In June 2014, [Dr. Wilson] continued to put [Plaintiff] on light duty. I have also considered SSRs 96-2p, 96-6p, and 16-3p and note that the Social Security Administration does not assess disability as a percentage of functioning. However, Dr. Wilson's opinion is consistent with the treatment records showing overall improved functioning over time. X-rays showed the fracture was healing and eventually did heal. Thus, this opinion is given great weight.

(Tr. at 28-29 (internal citations omitted).) Plaintiff challenges this analysis on four grounds. (Pl.'s Br. at 14-16.)

Plaintiff first observes that, "[w]hile Dr. Wilson might have indicated [Plaintiff's] ability to lift weight consistent with an exertional level of work[,] [Dr. Wilson] did not indicate the length of time [Plaintiff] would be able to stand, walk or sit," and that "[t]here is also no evidence to show that Dr. Wilson was aware of the way [the Social Security Administration ("SSA")] defines sedentary, light or medium duty work." (Id. at 14.) However, the Court notes that while Dr. Wilson did not include limitations on standing, walking, and sitting in his April 30, 2014 opinion, the ALJ also gave great weight to the opinion of the state agency consultant at the reconsideration stage (Tr. at 28), who opined that Plaintiff remained able to sit, stand, and walk for up to six hours in an eight-hour workday (Tr. at 75). Moreover, had Dr. Wilson merely restricted Plaintiff to light-medium duty and left it at that, Plaintiff's argument that Dr. Wilson lacked knowledge of the agency's exertional definitions might have had more force. However, Dr. Wilson specifically limited Plaintiff to "[l]ifting 30 [pounds] maximum with frequent lifting and or carrying of objects weighing up to 20 [pounds]" (Tr. at

606), and the ALJ expressly discussed that lifting/carrying opinion in his overall analysis giving Dr. Wilson's opinions great weight (Tr. at 28-29).[8]

Plaintiff further notes that, during his April 30, 2014 office visit with Dr. Wilson, as well as in later exams, Plaintiff "continued to walk with crutches" (Pl.'s Br. at 14 (citing Tr. at 610)), and displayed an antalgic gait, along with tenderness, pain on range of motion, and decreased strength in his left lower extremity (id. at 15 (citing Tr. at 621-23)). Thus, Plaintiff observes that "[i]t is not clear how a person who must use crutches to assist with walking would be able to frequently lift and carry 20 [pounds]." (Id. at 14.) Plaintiff's argument glosses over the fact that, while Plaintiff reported to Dr. Wilson on April 30, 2014 and June 11, 2014 that he continued to use a crutch to ambulate (Tr. at 610, 621), Dr. Wilson did not recommend (much less require) that Plaintiff continue to use a crutch. In fact, Dr. Wilson felt that Plaintiff should weight bear and progress his activities as tolerated. (Tr. at 611, 623.)

Plaintiff also maintains that Dr. Wilson's April 30, 2014 opinion did not merit great weight, because he later "limited [Plaintiff] to light duty work but also to activity as tolerated," which "[wa]s different then [sic] [Dr. Wilson's] earlier limitation to light-medium duty work." (Id. at 15 (citing Tr. at 621, 622).) That argument ignores the fact that, on April 30, 2014, the same date as Dr. Wilson's opinion that Plaintiff could perform light-medium work and lift and carry a maximum of 30 pounds and up to 20 pounds frequently, Dr. Wilson's treatment note reflects that he and Plaintiff "[t]ogether . . . agreed to proceed with light duty." (Tr. at 610 (emphasis added).) Thus, Dr. Wilson clearly viewed the phrase "light duty" to be consistent

_____

[8] The Court also notes that, as summarized in the ALJ's decision, Dr. Wilson did distinguish between sedentary/"sit down" work, which he opined was appropriate in February and March 2014 while the fracture was still in the early stages of healing, and "light to medium duty" with lifting up to 30 pounds and carrying up to 20 pounds, as reflected in the April 30, 2014 opinion several weeks later. (Tr. at 28, 606, 608, 609, 613-14.)

with the light-medium lifting and carrying restrictions he imposed. Moreover, the June 11, 2014 treatment note indicates that Dr. Wilson's office provided Plaintiff with a note for "continued light duty until [follow-up]," as well as to progress Plaintiff's "activity as tol[erated]" (Tr. at 623 (emphasis added)), which indicates that Dr. Wilson did not intend to offer restrictions different than his April 30, 2014 opinion.

Additionally, Plaintiff posits that Dr. Wilson's April 30, 2014 opinion predates Plaintiff's complaints of increasing lower back pain and leg cramps, as well as his Functional Capacity Evaluation ("FCE") and the opinion of an Independent Medical Examiner, Dr. Tadhg O'Gara, and that the ALJ "fail[ed] to discuss and reconcile the inconsistencies between [that evidence] and Dr. Wilson's April 2014 medical opinion before assigning it great weight." (Pl.'s Br. at 15.) However, Dr. O'Gara's opinion indicated that the FCE "was not really valid," and that he could not "comment on [Plaintiff's] work ability." (Tr. at 629.) Moreover, the ALJ afforded "little weight" to Dr. O'Gara's opinion chiefly because he could not opine as to Plaintiff's work ability (Tr. at 29), and Plaintiff did not challenge the weight the ALJ gave to Dr. O'Gara's opinion. Although Plaintiff's complaints of increasing lower back pain began in August 2014 (Tr. at 624), which post-dated Dr. Wilson's April 30, 2014 opinion, the ALJ gave great weight to the opinion of the state agency consultant at the reconsideration level, who had the benefit of that evidence and nonetheless concluded that Plaintiff remained capable of a range of light work (Tr. at 28, 75). Further, while Plaintiff made three complaints of leg cramps and/or spasms on June 17, 2015, May 17, 2016, and October 17, 2016 (Tr. at 712, 715, 732), Plaintiff provides no arguments why these reports of leg cramps should have compelled the ALJ to assign less weight to Dr. Wilson's April 30, 2014 opinion.

5.    Plaintiff's Subjective Complaints

Plaintiff faults the ALJ for "repeatedly mention[ing] [Plaintiff's] lack of frequent treatment as a basis for finding that his allegations are not consistent with the medical evidence," but "not ask[ing] [Plaintiff] why he did not seek more regular treatment." (Pl.'s Br. at 15.) According to Plaintiff, "his care was being managed through Worker's Compensation during this time frame," and he "likely had to seek approval from his Workers' Compensation carrier to see the physician." (Id. (emphasis added).) The ALJ observed, as one basis among many for concluding that Plaintiff's "allegations [we]re not entirely consistent with the evidence," that Plaintiff "had a period of time when he went without medication and was lost to orthopedic follow up," and that "[t]he fact that [Plaintiff] was able to tolerate such a period without treatment undermine[d] the severity of his alleged symptoms." (Tr. at 29; see also Tr. at 626, 659 (reflecting eight-month gap in treatment from September 12, 2014 to May 12, 2015, and Plaintiff's report to emergency room doctor that he had been out of pain medication for months and had been lost to orthopedic follow up).) Plaintiff's assertion that the Workers' Compensation approval process "likely" accounted for his lapse in treatment amounts to unsupported speculation, especially in light of the facts that 1) Plaintiff was fully aware of the availability of emergency care, as he visited emergency rooms on August 19, 2014 and May 12, 2015 (Tr. at 624, 659), and 2) Plaintiff received a lump sum Workers' Compensation settlement of $37,500 on January 12, 2016 (Tr. at 196-239), yet the record only reflects two visits to doctors in 2016 (Tr. at 712, 731).

Plaintiff also challenges the ALJ's reliance on "conflicting reports of when [Plaintiff's] back pain increased as a basis for questioning his credibility." (Pl.'s Br. at 15 (citing Tr. at 26-27).) In that regard, the ALJ noted as follows:

> [T]here was some inconsistency about when symptoms of his back condition had been exacerbated by his fall off the ladder. At first, he denied his back had been bothered by his fall. In August 2014, he said his back had started getting worse two weeks prior. Yet the next month, he mentioned his back had been a problem since January [2014]. This undermines [Plaintiff's] allegation that his back condition had been exacerbated by the fall.

(Tr. at 29 (internal citations omitted).) Notably, Plaintiff does not question the accuracy of the ALJ's observations, but rather contends that he "cannot be faulted for failing to explicitly report back pain when he presented to the [emergency room] for a left femur fracture that was severe enough to require surgical repair." (Pl.'s Br. at 16.) However, Plaintiff did not just "fail[] to explicitly report back pain" – he expressly denied pain anywhere but in his left leg and stated that he was doing well from his laminectomy. (Tr. at 341.) Moreover, Plaintiff did not report back pain at non-emergent follow-ups on March 12, 2014, March 20, 2014, April 30, 2014, June 11, 2014, and August 6, 2014. (Tr. at 610-11, 621-23.)

In short, Plaintiff has not demonstrated that the ALJ failed to conduct a proper function-by-function analysis of Plaintiff's work-related abilities in violation of <u>Mascio</u> and SSR 96-8p.

## B. Res Judicata

Next, Plaintiff contends that the Commissioner's "assertion of the affirmative defense of *res judicata* [in her Answer] was improper" (Pl.'s Br. at 16), because neither the ALJ nor the Appeals Council "mention[ed] the doctrine of *res judicata* or attempt[ed] to dismiss [Plaintiff's] claim on these grounds" (<u>id.</u>). However, as pointed out by the Commissioner, although

Plaintiff filed previous applications for benefits in 2007 and 2013, "because the ALJ did not raise *res judicata*, and [the Commissioner] is not raising it at this stage in the proceedings, it has no bearing on the outcome of [Plaintiff's] case." (Def.'s Br. [Doc. #19] at 11.)

C.     Appointments Clause

Finally, Plaintiff argues that his "claim should be remanded for a new hearing before a different constitutionally appointed judge because [ALJ] Saindon's appointment did not comply with the Appointments Clause [of the United States Constitution] at the time she rendered her decision in [Plaintiff's] claim. (Pl.'s Br. at 17.) In support of that argument, Plaintiff relies on Lucia v. Securities & Exch. Comm., 585 U.S. ___, 138 S. Ct. 2044 (2018). In considering this contention, the Court notes that a similar claim was considered and rejected in a prior case in this District, as follows:

> In Lucia v. Securities and Exchange Commission, the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. 138 S. Ct. at 2055. While this issue has not been addressed by the Fourth Circuit Court of Appeals, District Courts within the Circuit have held under Lucia that only "one who makes a timely [Appointment Clause] challenge" is entitled to relief. See e.g., Garrison v. Berryhill, No. 1:17-CV-00302-FDW, 2018 WL 4924554, at *2 (W.D.N.C. Oct. 10, 2018) (citing Lucia, 138 S. Ct. at 2055) (internal citation omitted); see also Britt v. Berryhill, No. 1:18-CV-00030-FDW, 2018 WL 6268211, at *2 (W.D.N.C. Nov. 30, 2018) ("To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings."). In Lucia, the Supreme Court acknowledged the challenge was timely because it was made before the Commission.
>
> Plaintiff's arguments to the contrary are unpersuasive. Although it is not required for one to raise a constitutional issue solely before the ALJ, Lucia made it clear that one must challenge their issue at some point during the administrative proceedings. Lucia v. S.E.C., 138 S. Ct. at 2055 ("To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled."). Unfortunately, Plaintiff did not raise this issue at any point during his proceedings with the Social Security

> Administration—not to the presiding ALJ, or to the Appeals Counsel. To the extent <u>Lucia</u> applies to Social Security ALJs, Plaintiff has forfeited his Appointment Clause issue by failing to raise it during his administrative proceedings.

<u>Martin v. Berryhill</u>, No. 1:18CV115, Report and Recommendation (Doc. #17) (M.D.N.C. Dec. 11, 2018) (Webster, M.J.), adopted by Order (Doc. #19) (M.D.N.C. Jan. 4, 2019) (Eagles, J.).

In the present case, as in <u>Martin</u>, Plaintiff has forfeited his Appointments Clause issue by failing to raise it during his administrative proceedings. This determination is consistent with the great weight of authority since <u>Lucia</u>. <u>See, e.g.</u>, <u>Lewark v. Saul</u>, No. 2:18-CV-45, 2019 WL 2619370 (E.D.N.C. June 26, 2019); <u>Morrison v. Berryhill</u>, No. 5:18-CV-156, 2019 WL 2607026 (W.D.N.C. June 25, 2019); <u>Edwards v. Berryhill</u>, No. 2:18CV121, 2019 WL 1919167, at *4 (E.D. Va. Apr. 29, 2019); <u>Shelton v. Berryhill</u>, No. 2:17CV609, 2019 WL 1330897, at *11-12 (E.D. Va. Mar. 25, 2019); <u>Shipman v. Berryhill</u>, No. 1:17-CV-00309-MR, 2019 WL 281313, at *3 (W.D.N.C. Jan. 22, 2019); <u>Velasquez v. Berryhill</u>, No. CV 17-17740, 2018 WL 6920457, at *3 (E.D. La. Dec. 17, 2018); <u>Abbington v. Berryhill</u>, No. CV 1:17-00552-N, 2018 WL 6571208, at *8 (S.D. Ala. Dec. 13, 2018); <u>Weatherman v. Berryhill</u>, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at *4 (W.D.N.C. Dec. 10, 2018); <u>Pearson v. Berryhill</u>, No. 17-4031-SAC, 2018 WL 6436092, at *4 (D. Kan. Dec. 7, 2018); <u>Faulkner v. Comm'r of Soc. Sec.</u>, No. 117CV01197STAEGB, 2018 WL 6059403, at *3 (W.D. Tenn. Nov. 19, 2018); <u>Flack v. Comm'r of Soc. Sec.</u>, No. 2:18-CV-501, 2018 WL 6011147, at *4 (S.D. Ohio Nov. 16, 2018); <u>Garrison v. Berryhill</u>, No. 1:17cv302, 2018 WL 4924554, at *2 (W.D.N.C. Oct. 10, 2018); <u>Davidson v. Comm'r of Soc. Sec.</u>, No. 2:16CV102, 2018 WL 4680327, at *2 (M.D. Tenn. Sept.

28, 2018); Stearns v. Berryhill, No. C17-2031, 2018 WL 4380984, at *5 (N.D. Iowa Sept. 14, 2018); Karen S. v. Comm'r of Soc. Sec., No. 2:17CV302, 2018 WL 4053327, at *3 n.1 (E.D. Wash. Aug. 24, 2018); Trejo v. Berryhill, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). Therefore, Plaintiff's claim should be dismissed.[9]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #14] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #18] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 5th day of August, 2019.


　　　　　　　　　　　　/s/ Joi Elizabeth Peake
　　　　　　　　　　　United States Magistrate Judge

---

[9] Notably, several of these cases are presently on appeal to their respective Courts of Appeal, including Shelton v. Berryhill (E.D. Va.), on appeal to the Fourth Circuit, No. 19-1715 (4th Cir.). Even more notably, two recent decisions in the Eastern District of North Carolina have reached the opposite conclusion, and found that an Appointments Clause challenge need not be raised in the administrative proceeding, that the plaintiff's Lucia claim was not forfeited, and that remand was required. See Probst v. Berryhill, No. 5:18CV130, 2019 WL 1749135 (E.D.N.C. March 22, 2019); Bradshaw v. Berryhill, 372 F. Supp. 3d 349 (E.D.N.C. 2019). Those decisions are also on appeal to the Fourth Circuit. Bradshaw v. Berryhill, No. 19-1531 (4th Cir.), Probst v. Berryhill, No. 19-1529 (4th Cir.) Given these developments, it would be within the discretion of the Court to elect to stay the present case pending resolution of those issues by the Fourth Circuit. However, the present Recommendation has been entered in light of the prior decision in this District in Martin and in order to address the additional, non-Lucia claims presented for resolution.